1              **IN THE UNITED STATES DISTRICT COURT**
              **FOR THE SOUTHERN DISTRICT OF TEXAS**
2                       **HOUSTON DIVISION**

3   UNITED STATES OF AMERICA        )        NO. 4:18-CR-655-1
                                    )
4                                   )
    VS.                             )        Houston, Texas
5                                   )        9:00 a.m.
                                    )
6   AKIL KURJI                      )        June 27, 2019

7


8      ********************************************************

9

                            **SENTENCING**
10

           **BEFORE THE HONORABLE ALFRED H. BENNETT**
11

               **UNITED STATES DISTRICT JUDGE**
12

                       **VOLUME 1 OF 1**
13

14     ********************************************************
    APPEARANCES:
15
    FOR THE GOVERNMENT:
16
        Ms. Danielle M. Garten
17      Mr. Justin P. Murphy
        U.S. Department of Justice
18      450 5th Street NW
        Washington, DC  20530
19      Tel:  202-514-4687
        Email:  Danielle.garten@usdoj.gov
20              Justin.murphy@usdoj.gov

21      Mr. Vernon L. Lewis
        U.S. Attorney's Office
22      1000 Louisiana, Suite 2300
        Houston, Texas
23      Tel:  713-567-9505
        Email:  Vernon.lewis@usdoj.gov
24

25

1  APPEARANCES:   (CONTINUED)

2  FOR THE DEFENDANT:

3       Mr. James Madison Ardoin III
         Jones Walker, LLP
4        811 Main Street, Suite 2900
         Houston, Texas  77002
5        Tel:  71-437-1811
         Email:  Jardoin@joneswalker.com
6

7  ALSO PRESENT:

8       Ms. Kim Jones, U.S. Probation
         Ms. Angelica Harris, Law Student
9

10 COURT REPORTER:

11      Ms. Kathleen K. Miller, CSR, RMR, CRR
         515 Rusk, Room 8004
12       Houston, Texas  77002
         Tel:  713-250-5087
13
   Proceedings recorded by mechanical stenography.
14 Transcript produced by computer-assisted transcription.

08:49:43  15

16

17

18

19

20

21

22

23

24

25

1                    P R O C E E D I N G S
2    (Defendant present.)
3                    THE COURT:  Good morning.  Thank you.  Please
4    have a seat.
09:00:53  5                    Cause Number 4-18-CR-655-1, United States of
6    America vs. Akil Kurji.  Counsel, please announce your
7    appearances for the record.
8                    MS. GARTEN:  Good morning, Your Honor.
9    Danielle Garten on behalf of the United States, and joined
09:01:07  10   by my colleagues Justin Murphy and Vernon Lewis, and we
11   also have Angelica Harris, who is a law student.
12                    THE COURT:  Very well.  Good morning.
13   Counselor.
14                    MR. ARDOIN:  Good morning, Your Honor.  Jimmy
09:01:18  15   Ardoin on behalf of Akil Kurji, who is present in the
16   courtroom.
17                    THE COURT:  Sir, what is your name?
18                    THE DEFENDANT:  My name is Akil Kurji.
19                    THE COURT:  Very well.  Let the record reflect
09:01:29  20   that the defendant is present and is represented by legal
21   counsel.
22                    And who is here from probation?
23                    PROBATION OFFICER:  Kim Jones for U.S.
24   Probation, Your Honor.
09:01:42  25                    THE COURT:  Very well.  This is a sentencing

1    hearing, and I want to briefly describe the Court's

2    sentencing procedures.  The Supreme Court has held in

3    *United States vs. Booker* that the United States sentencing

4    guidelines are advisory, not mandatory, for judges.  *Booker*

09:01:58   5    requires a sentencing court to consider guideline ranges,

6    but it permits the Court to tailor the sentence in light of

7    other statutory concerns as well.

8                    The Court in the exercise of its

9    sentencing discretion will rely on the factors set out in

09:02:11   10    Section 3553(a) to fashion an appropriate sentence to

11    achieve the Congressionally mandated purposes of sentencing

12    as set forth in the Sentencing Reform Act of 1984.

13                    The Court will endeavor to faithfully

14    apply the directives within the guidelines in their

09:02:26   15    entirety to determine the total offense level and criminal

16    history category under the guidelines.  Thereafter, the

17    Court will exercise its discretion to determine the

18    appropriate sentence.  In so doing the Court will give

19    considerable weight to the sentencing range calculated

09:02:41   20    under the guidelines.  Any comments by the Court during the

21    course of this sentencing are not to be construed as an

22    indication that the Court, in fact, believes that the

23    guidelines are mandatory, or that they constrain the

24    Court's ultimate sentencing discretion.

09:02:55   25                    The standard of proof for factual findings

1  in connection with sentencing is preponderance of the

2  evidence.   In determining whether that standard is met, a

3  presentence report is generally considered sufficiently

4  reliable to be considered by the trial court as evidence in

09:03:08  5  making the factual determinations required by the

6  sentencing guidelines.

7            In this case, in preparation for today's

8  hearing, the Court has reviewed the presentence report; the

9  addendum to the presentence report; the United States

09:03:39  10  sentencing memorandum, which is at Document Number 37; the

11  United States motion to depart from the guidelines, which

12  is at Document 36.

13           The Court received last night the

14  defendant's sentencing memorandum which is Document Number

09:03:59  15  41.   In addition, the Court reviewed a filing by the

16  defense, which is Document Number 42, defendant's letters

17  in advance of sentencing.

18           The Court also had available to it the

19  plea agreement, the information, the sentence data sheet,

09:04:36  20  the waiver of indictment, and the factual -- the factual

21  basis for the offense, which the Court rereviewed.

22           Counsel for the government, were there any

23  additional items that the Court needed to review in advance

24  of this hearing?

09:04:59  25           MS. GARTEN:  No, Your Honor.  The government

1  filed some objections to the PSR.

2          THE COURT:  We will turn our attention to that

3  shortly.

4               Counsel for the defense, were there any

09:05:07  5  additional items that the Court needed to review for this

6  hearing?

7          MR. ARDOIN:  No, Your Honor.

8          THE COURT:  As the government noted in

9  connection with the presentence report, the government did

09:05:36  10  file several objections.  Ms. Gartner, in connection with

11  the objections, are there any that the Court needs to take

12  up by way of ruling for purposes of the calculations needed

13  for purposes of sentencing?

14          MS. GARTEN:  No, Your Honor.  The June 13th

09:05:57  15  addendum to the PSR addressed all the government's

16  concerns.

17          THE COURT:  Very well.  So there are no

18  objections you wish to present to the Court?

19          MS. GARTEN:  No, Your Honor.

09:06:04  20          THE COURT:  Very well.

21               Counsel for the defense, are there any

22  objections to the presentence report that you would like to

23  address with the Court that will affect the calculations?

24          MR. ARDOIN:  No, Your Honor.  We did file

09:06:16  25  objections, Your Honor, but they do not affect the

1  calculations.

2            THE COURT:  And the Court noted those.  They

3  were factual disputes, and so I wanted to make sure of

4  that.

09:06:24  5            MR. ARDOIN:  Yes, Your Honor.

6            THE COURT:  Mr. Kurji, have you received a copy

7  of the presentence report?

8            THE DEFENDANT:  Yes, Your Honor.  Yes, Your

9  Honor.

09:06:31  10            THE COURT:  Have you discussed it with your

11  lawyer?

12            THE DEFENDANT:  Yes, Your Honor.

13            THE COURT:  Did he answer all of your

14  questions?

09:06:35  15            THE DEFENDANT:  Yes, Your Honor.

16            THE COURT:  Your lawyer has indicated that he

17  had no objections that he wished to bring to the Court's

18  attention for purposes of the calculations that would be

19  done under the sentencing.  He did mention that some of

09:06:52  20  them were factual objections, and the Court notes that it

21  has reviewed those.

22                Having set that aside, do you personally

23  have any objections you need to bring to the Court's

24  attention?

09:07:04  25            THE DEFENDANT:  No, Your Honor.

KATHY MILLER, RMR, CRR  -  kathy@miller-reporting.com

1          THE COURT:  Very well.

2               These are the Court's final guideline

3 findings and legal conclusions.  The total offense level is

4 15.  The criminal history category is one.  Based upon

09:07:35  5 those determinations, the guidelines provide for a term of

6 imprisonment of 18 to 24 months, a term of supervised

7 release of one to three years.  The fine range has been

8 calculated as between $23,522 and $117,612, and a $100

9 special assessment.

09:08:00  10               What is the government's position on

11 sentencing?

12               Counsel, you all may have a seat.

13          MS. GARTEN:  Your Honor, the government would

14 note that the motion to depart from the guidelines is still

09:08:17  15 pending, and in that motion the United States moves for a

16 one-level departure pursuant to 5K1.1 based on defendant's

17 substantial assistance.  And if the Court grants, the

18 offense level would move to a 14, and the corresponding

19 guidelines range would move to 15 to 21 months.

09:08:34  20          THE COURT:  Any objections to the government's

21 motion?

22          MR. ARDOIN:  No, Your Honor.

23          THE COURT:  The government's motion is granted.

24 The recalculation provides for the total offense level at

09:08:43  25 14, and the term of imprisonment of 15 to 21 months.

1                   And just to confirm, Ms. Jones, are there

2   any other changes based upon that ruling?

3                   PROBATION OFFICER:  No, Your Honor.

4                   THE COURT:  Very well.  Thank you.  Counselor.

09:08:55   5                   MS. GARTEN:  Okay.  Your Honor, the United

6   States recommends a sentence of 18 months in custody, a

7   monetary fine in the amount of $20,000, a mandatory special

8   assessment of $100, a period of supervised release of three

9   years, and no order of restitution.

09:09:13   10                   The government is requesting --

11                   THE COURT:  Just for clarification, in regards

12   to the fine range, the Court earlier stated that the fine

13   range was $23,522 to $117,000, so you're recommending to

14   the Court a fine underneath that floor amount?

09:09:32   15                   MS. GARTEN:  Correct, Your Honor.  And the

16   sentencing guideline also notes but not less than $20,000.

17                   THE COURT:  Very well.  You may continue.

18                   MS. GARTEN:  Okay.  Thank you.  The government

19   is requesting a period of incarceration at the mid point of

09:09:44   20   the guidelines range, the guidelines range being 15 to 21

21   months, which is reasonable and not greater than necessary

22   under 18 USC, 3553 factors.

23                   The Sentencing Commission has been clear

24   that a period of incarceration is appropriate stating, "It

09:10:00   25   is the intent of the Commission that alternatives such as

1 community confinement not be used to avoid imprisonment of

2 antitrust offenders."

3          We would like to briefly discuss some of

4 the sentencing factors and address certain items that have

09:10:13   5 been raised by Mr. Kurji in his sentencing memorandum.

6          Your Honor, you have before you one of the

7 two masterminds who coordinated and implemented this

8 rampant price-fixing conspiracy that extended over two

9 years' time and involved at least nine other companies and

09:10:29  10 individuals.  This conspiracy affected sales of products to

11 thousands of customers, including churches, charities, and

12 other organizations across the United States and abroad.

13          The sole purpose of this conspiracy was

14 for Mr. Kurji and his co-conspirators to raise prices, end

09:10:46  15 competition, and make more money for themselves through a

16 greedy and illegal endeavor.

17          In the prior individual sentencings before

18 this Court, Your Honor has asked us to provide a relative

19 comparison of culpability between and amongst the

09:11:00  20 co-conspirators.  As noted above, Mr. Kurji is one of the

21 two masterminds of this collusive conspiracy, the other

22 being Mr. Mashnoon Ahmed, who the Court sentenced on May

23 30th to six months in custody, three years of supervised

24 release, and a $20,000 fine.

09:11:16  25          We thought it would be apt to provide the

1 Court with a brief comparison between Mr. Kurji and

2 Mr. Ahmed, particularly in light of Mr. Kurji's arguments

3 that he is somehow less culpable than Mr. Ahmed because his

4 company had a smaller volume of affected commerce.  The

5 fact that Mr. Kurji's company was smaller does not mean he

6 benefited less from his greed and it doesn't minimize his

7 role in this conspiracy.

8              As Your Honor is aware, the sentencing

9 guidelines in Section 2R1.1 have already accounted for the

10 relative volume of commerce dollars amounts.  It is

11 reflected in his guidelines range and recommended sentence,

12 which is at the mid point of the range.

13              Mr. Kurji's effort to assign more blame to

14 others does not change or minimize his own actions.  It

15 does not change the overwhelming evidence of his leading

16 role in the conspiracy and, frankly, raises some concerns

17 as to whether he is truly accepting responsibility for his

18 actions.

19              As Your Honor will hear in a moment, as we

20 share some specific evidence, it is overwhelmingly clear

21 what Mr. Kurji's role was in the conspiracy:  Initiator,

22 organizer, monitor.  The agreement began with him.

23              The evidence over a two-year period of

24 time demonstrates the differences between Mr. Kurji and

25 Mr. Ahmed's conduct, and this is borne out by Mr. Kurji

1   receiving a 4.3B1.1 enhancement and Mr. Ahmed previously

2   receiving a 3.1 -- 3.3B1.1 enhancement.

3                As Your Honor may recall, Mr. Ahmed

4   recruited co-conspirators to the price-fixing agreement.

09:12:55   5   When search warrants were executed on the conspirators in

6   June of 2016, Mr. Ahmed lied to the FBI.  But once

7   Mr. Ahmed retained counsel, he cooperated extensively with

8   the government's ongoing investigation and both he and his

9   company received substantial cooperation credit for that.

09:13:12   10                As we will discuss in some detail,

11   Mr. Kurji's situation is different.  For Mr. Kurji the

12   illegal agreement started with him.  He organized and

13   planned the first in-person meeting where the rampant price

14   fixing conspiracy was hatched.  In spring of 2014 he wrote

09:13:31   15   to his competitors complaining about pricing and suggesting

16   that they, "Work together and not kill each other."  And

17   telling them, "We all just need to sit and talk."

18                To implement his plan, Mr. Kurji organized

19   the in-person meeting that kicked off the conspiracy in May

09:13:46   20   of 2014.  As part of his pitch to conspire Mr. Kurji

21   explained his strategy.  "Let's determine who will win by

22   customer service and strategy, not cutting pricing.  We can

23   all make more money."

24                He contacted his competitors suggesting

09:14:04   25   they meet to sit and talk about working together to raise

1  prices.  He even made the dinner reservations at Del

2  Frisco's Steakhouse here in Houston, himself, and then

3  reached out to each of his competitors to make sure they

4  planned to attend.  This meeting, the meeting he planned,

5  and the meeting he got his competitors to attend, is where

6  the price fixing agreement began.

7              To make it clear that he was serious about

8  the conspiracy coming to fruition, the day after the

9  competitors reached their illegal agreement at Del

10  Frisco's, he texted with one of his competitors about

11  changing prices, noting his satisfaction that they had

12  increased by telling the other seller that, "The prices

13  look good."

14              The evidence also demonstrates another

15  point of comparison between Mr. Ahmed and Mr. Kurji, that

16  Mr. Kurji organizing the agreement lent itself to his role

17  as the chief coordinator and moderator throughout the

18  conspiracy period.  Over the course of two years, he was by

19  far the most proactive, visible, and assertive member of

20  the price-fixing agreement.  He reached out to competitors

21  dozens of times to make sure everyone was acting in

22  accordance with the conspiracy.  He actively and routinely

23  moderated pricing amongst competitors; suggested,

24  communicated, and coordinated price increases; and

25  routinely policed his competitors' websites to ensure

1  everyone was in line.

2              Here are a few examples of his activities

3  over the course of the two-year conspiracy.

4              Just three days after the May 2014 Del

09:15:37  5  Frisco's dinner that he organized, Mr. Kurji wrote to a

6  competitor noting, "We all changed it.  Waiting on you.

7  Mine will be done in ten."

8              Two days later Mr. Kurji texted another

9  competitor telling him that another co-conspirator wanted

09:15:51  10  him to get in touch, "Because he was thinking we should

11  raise another 7 to 8 percent."  Similarly, in October of

12  2014, Mr. Kurji suggested a three-way call between

13  competitors to discuss raising prices and offered to talk

14  to a fourth competitor individually.

09:16:05  15              He texted with a competitor and wrote that

16  they should, "Raise prices more," and noted the importance

17  of, "Strictly following the new price so they could make

18  more money."  He also agreed to remind the fourth

19  competitor to, "Stay the same on prices all

09:16:21  20  across-the-board.  No ifs and buts."

21              In October of 2015 Mr. Kurji suggested to

22  a co-conspirator, "Let's increase buttons and tattoos.  I

23  will match everything you do by today, so 10 percent off

24  shipping and wristbands."

09:16:36  25              Mr. Kurji's management of the conspiracy

1 extended into 2016 when he suggested that all of the

2 co-conspirators use a Google Doc that included everyone's

3 pricing, so it would be easier.

4                Mr. Kurji's enthusiastic and proactive

09:16:52 5 policing and directing of the conspiracy allowed it to

6 continue effectively for as long as it did, and the only

7 reason the conspiracy stopped in June of 2016 was because

8 Mr. -- Mr. Kurji and his co-conspirators got caught.  They

9 didn't stop on their own.

09:17:07 10                In addition to coordinating the agreement,

11 Mr. Kurji also took a leading role in proposing price

12 increases, and taking other steps to eliminate competition.

13 Some examples include in October of 2014 pitching a price

14 increase to a competitor stating, "Let's raise prices on

09:17:25 15 lanyards.  If the four of us can keep a good trust, we will

16 all do well."

17                In October 2015, Mr. Kurji suggested

18 eliminating a 10 percent discount and then poked his

19 competitors when they were slow to respond.  Texting them,

09:17:40 20 "Hey, you guys still have the 10 percent on other products.

21 Please, take it off per the agreement.  If we work together

22 we will all prosper, and let's respect that and try to keep

23 this agreement or no one wins.  Let's try to tighten that

24 bond, Bro."

09:17:54 25                Finally, in 2016, Mr. Kurji pointed out to

1   his co-conspirators how the agreement eliminated customers'

2   choices, writing, "I say we raise it.  People are willing

3   to pay.  If the top three companies have higher prices,

4   they have no choice."

09:18:08   5                    Mr. Kurji's goal was simple, and is best

6   described in his own words.  "Look, I think the three of us

7   are working together, so let's be more greedy."  He acted

8   in accordance with that directive for years, aggressively

9   policing the agreement, checking prices, reaching out to

09:18:25   10   competitors to ask whether prices were a certain way, or

11   making sure they raised prices when they were all supposed

12   to, all in the name of greed and victimizing their

13   customers.

14                    Finally, the evidence in our lengthy

09:18:37   15   investigation demonstrates the most stark comparison

16   between Mr. Kurji, and Mr. Ahmed, and every other defendant

17   that has been before Your Honor.  Mr. Kurji refused to

18   cooperate with the government's investigation for almost

19   two years.  The refusal to cooperate in the investigation

09:18:54   20   shows a reluctance to accept responsibility and

21   accountability for his role in this criminal enterprise.

22                    Mr. Kurji did eventually provide

23   substantial assistance to law enforcement, hence the

24   sentencing guidelines departure.  As detailed in our

09:19:09   25   papers, Mr. Kurji's cooperation has lead to substantial

1 benefits for him, including a departure from the guidelines

2 for his individual conduct.  The benefit Mr. Kurji is

3 receiving adequately accounts for the cooperation he has

4 provided to the government.

5 Mr. Kurji was unquestionably one of the

6 two masterminds, and the organizer of the price-fixing

7 conspiracy.  He victimized people he didn't know in the

8 name of greed and personal financial gain.  His

9 unapologetic quest for money through creating and

10 maintaining an illegal conspiracy harmed literally

11 thousands of nonprofit entities, religious establishments,

12 individuals and businesses seeking to purchase products in

13 what they believed to be a competitive marketplace.

14 Mr. Kurji's own words sum up his view on

15 the customers he served in this way.  "Fuck all these

16 people.  We shouldn't give any discounts.  If the three of

17 us have an agreement, why not make more money?"

18 In light of Mr. Kurji's criminal acts, the

19 government's requested sentence in the middle of the

20 guidelines is appropriate, reasonable, and fair.  Thank

21 you.

22 THE COURT:  Counselor, you have described the

23 defendant as one of the two masterminds, but in your

24 presentation it seems as if you are making the point that

25 he was, if not the main organizer, the point person for the

1    conspiracy.  Did I understand you correctly?

2              MS. GARTEN:  Correct, Your Honor.

3              THE COURT:  Very well.  What is the defense's

4    position on sentencing?

09:21:14  5              MR. ARDOIN:  Your Honor, I don't want to have

6    this Court mistake what I have written as argument as

7    somehow an interpretation that Mr. Kurji has not accepted

8    responsibility for his actions, because when you hear from

9    him, he has.  In fact, I got involved in this case very

09:21:35  10   late in the game, and that's one of the things that I want

11   to address with regard to the government's notion that

12   Mr. Kurji refused to cooperate in this whole investigation.

13             I have seen the gamut of emotions in my

14   client when I first represented him, and I truly believe

09:21:55  15   that he is a changed person, that this has -- this whole

16   thing has -- has really brought out with him the notion of

17   taking a negative and turning it into a positive, and I

18   think you will hear that from him.

19             I myself have run the gamut of emotions in

09:22:12  20   this case, Your Honor, because I have gone from angry and

21   disappointed in the way that negotiations were handled with

22   the government, and -- and now I'm just kind of sad about

23   the whole thing from what I hear from them, frankly, and

24   what I have read in their sentencing memorandum.  Because

09:22:32  25   when you read their sentencing memorandum, what is left out

1  of it is, and I wasn't -- again, I wasn't involved until

2  very late in this process, until probably a year-and-a-half

3  after the raid.

4              And when they talk about refusal to

09:22:52  5  cooperate, I am somewhat a little alarmed because,

6  essentially, they are interpreting Mr. Kurji's -- they cite

7  one example specifically where they say he refuses to

8  provide his location.  And what happened that day, is when

9  they raided the corporation, Mr. Murphy was there, and he

09:23:10  10  called Mr. Kurji, and he started asking Mr. Kurji questions

11  over the phone.  Mr. Kurji, rather than talking, decided

12  that, hey, you know what, I need to keep my mouth shut and

13  figure out my legal options here.

14              And it's scary that the government

09:23:30  15  interprets that as a refusal to cooperate.  It's really

16  scary that somehow that is turned into a refusal to

17  cooperate.

18              He hired counsel.  He hired Rocket Rosen,

19  who is one of the best criminal defense lawyers in this

09:23:47  20  area.  They started cooperating by providing documents.  I

21  know the government takes issue with the fact that -- and

22  they footnote and say providing documents pursuant to a

23  Grand Jury subpoena is not cooperation.  I think -- I have

24  dealt with enough AUSAs who would say that when you call

09:24:04  25  them and they don't have to file motions to compel and you

1  are not contesting the subpoena, you are voluntarily

2  producing documents, that most of them would view that

3  as -- as a form of being cooperative with the government

4  and trying to, when you voluntarily hand over your cell

09:24:18  5  phone, that sort of stuff.

6              But in terms of coming to the table to

7  actually cooperate, what the government leaves out is the

8  fact that Rocket Rosen during the course of this thing, it

9  was discovered he had ALS, and his health started to

09:24:34  10  deteriorate.  And the fact that -- that now because some

11  issue with counsel being able to get him to the table is

12  now going to be used against him, it's very concerning.  I

13  don't -- I don't disagree and we don't take issue with what

14  the text messages say.  We don't take issue with that at

09:24:55  15  all, Your Honor.

16              THE COURT:  You say you don't take issue with

17  it, but you -- because the thrust of the text messages

18  during the government's presentation, for lack of a better

19  phrase, or word, was that the defendant was a ringleader.

09:25:12  20              MR. ARDOIN:  Correct.

21              THE COURT:  In your sentencing memorandum, you

22  challenge that and more aptly, from your perspective,

23  describe him as a policeman.

24              MR. ARDOIN:  And the government used that very

09:25:22  25  phrase during their argument here today.

1          THE COURT:  So, to the extent that -- well,
2  I'll let you address that.
3          MR. ARDOIN:  And I am not saying he shouldn't
4  be held as someone who was considered a leader, but the
09:25:37   5  notion that someone who was a small fish in this pond was
6  somehow the mastermind of this, and --
7          THE COURT:  Well, that's the question that I
8  have.
9          MR. ARDOIN:  Right.
09:25:51   10          THE COURT:  And kind of two-fold for you.
11          MR. ARDOIN:  Sure.
12          THE COURT:  And first part, a thief is a thief.
13          MR. ARDOIN:  And we do not contest that.
14          THE COURT:  So large, small, or in the middle.
09:26:09   15          MR. ARDOIN:  Absolutely, Your Honor.  And let
16  me say, pausing there for a moment, I think, you know -- I
17  don't know if the Court -- we sat here for Mr. Ahmed and
18  Mr. Akhter's sentencing, and every -- every defendant that
19  has come before you has asked for probation.  We heard the
09:26:25   20  message loud and clear.  I have not asked for probation in
21  this case.  But what -- what I think is disappointing is
22  the government says they want you to consider the 3553
23  factors, but they completely ignore what other people got
24  in the case, and they don't adjust their request
09:26:42   25  accordingly.

1          THE COURT:  Well, and moving to that, set

2   aside, from my perspective, the amount that was involved

3   argument.

4          MR. ARDOIN:  Sure.

09:26:58   5          THE COURT:  Turning, more appropriately, to the

6   government's main argument that this was the main guy, this

7   was the ringleader --

8          MR. ARDOIN:  Yes, Your Honor.

9          THE COURT:  -- and that resonates if, in fact,

09:27:10   10   that is true, from -- I'm trying to get a better

11   understanding from your position because you seem to push

12   back on that.

13          MR. ARDOIN:  I do, Your Honor, because how --

14   we don't take issue with the fact that he is the most

09:27:22   15   active person on the text message.

16          THE COURT:  He set the dinner up.

17          MR. ARDOIN:  No doubt.

18          THE COURT:  And he monitored whether or not

19   prices were, in fact, being adjusted, according to the text

09:27:33   20   messages.

21          MR. ARDOIN:  That is right.  We take no issue

22   with that.  But we have tried to tell them that he -- he is

23   a former employee of Mr. Ahmed.  Before he started his

24   company, he was an employee working for Mr. Ahmed.  So it's

09:27:47   25   not unreasonable to understand that Mr. Ahmed would enlist

1  him.  Mr. Ahmed and his brother have already engaged in

2  another price fixing scheme on koozies that they were so

3  entrenched in that they were able to wear wires.  They

4  cooperated.

09:28:03  5          THE COURT:  Well, let's set aside the

6  cooperation portion for a moment --

7          MR. ARDOIN:  Sure.

8          THE COURT:  -- and I will come back to that.

9  But to the extent that this is the defendant that set the

09:28:14  10  meeting up, monitored the progression of the conspiracy,

11  and, to use your word, police the conspiracy by texting his

12  competitors to make sure that prices were, in fact, being

13  raised or matched, that puts him, if not in the driver's

14  seat, definitely in the front seat of this conspiracy.  If

09:28:47  15  that is correct, in your sentencing memorandum you note

16  that you were here for Mr. Ahmed, who the government

17  described as a co-ringleader, a ringleader, that defendant

18  was sentenced to six months.

19          MR. ARDOIN:  Yes, Your Honor.

09:29:11  20          THE COURT:  So to the extent that this

21  defendant is in the front seat as one of these ringleaders,

22  at a minimum, for sentencing parity, why shouldn't he at

23  least be looking at the same sentence as opposed to the

24  three months that you suggest?  Or to 60 -- was it 60 days?

09:29:31  25  I'm sorry.

1          MR. ARDOIN:  Two months, Your Honor.  I don't

2   believe he is in the front seat.  I believe he's in the

3   car.  I mean, if we're looking at it, I mean, how many drug

4   conspiracy cases have we seen come through this courtroom

5   where the leader of the cartel is not on the text messages?

6   Where the leader of the cartel is not on the Title III

7   wiretaps?  But they have their henchmen out actively doing

8   everything.  And the person who is making $41 million a

9   year in sales, 20 times what my client is making, who was

10  his superior at one point from an employer/employee

11  relationship.  I don't dispute the notion he is in the car.

12          THE COURT:  What evidence do you have at this

13  time to suggest that this defendant was acting on orders or

14  instructions from another defendant in this conspiracy,

15  other -- because what I have seen doesn't suggest that.

16          MR. ARDOIN:  I understand that, Your Honor.

17  And we have tried to convey that through our cooperation

18  with the government, but they -- they don't want to believe

19  it.  We don't have any text messages.  We don't have any

20  e-mails.  It's hard to prove a negative.  You know, it's

21  difficult to prove something that only exists in the

22  conversations between two people.  And there -- I just --

23  it's very frustrating because we know what his true role

24  was.

25          THE COURT:  Well, I appreciate the argument,

09:29:43
09:30:06
09:30:24
09:30:37
09:31:00

1  but even at a minimum of evidence, the preponderance of the

2  evidence, not even what you would be facing at trial, on a

3  preponderance of the evidence, you don't offer any --

4           MR. ARDOIN:  I know, Your Honor.

09:31:18  5           THE COURT:  -- evidence he was acting at the

6  behest or orders or instructions of another co-defendant.

7  The only thing that I have before this Court are the actual

8  text messages from this defendant, when viewed in the cold

9  hard light of this courtroom, suggest that he was the

09:31:35  10  ringleader and the instigator of this conspiracy.  Am I

11  reading this wrong?

12           MR. ARDOIN:  I can see -- believe me, I

13  understand how the text messages convey that.  You are not

14  reading those text messages wrong.  My suggestion to you

09:31:48  15  is, and what we have tried to suggest to the government is,

16  that those text messages were sent and coordinated at the

17  direction of Mr. Ahmed and Mr. Akhter.

18           THE COURT:  A proposition for which you offered

19  no evidence.

09:31:59  20           MR. ARDOIN:  Unfortunately, Your Honor, we

21  don't have anything in writing to prove that.

22           THE COURT:  Very well.  Anything else, sir,

23  before I hear from your client?

24           MR. ARDOIN:  Yes, Your Honor.  And, again, Your

09:32:11  25  Honor, I don't want you to mistake my arguments --

1          THE COURT:  No.

2          MR. ARDOIN:  -- against him.

3          THE COURT:  I take it as you doing your job and

4  doing it well.  I understand exactly where you're coming

09:32:21   5  from.

6          MR. ARDOIN:  You know, it's tough.  I think

7  these cases, as the Court noted in the other sentencing,

8  you can't -- to be fair you cannot distinguish whether

9  someone goes in and robs a bank with an AR-15, or whether

09:32:41   10  someone steals doing it behind a desk with a computer.  We

11  get that, and my client completely understands that.

12          And like I said, I think, Your Honor,

13  where you will see the distinction with him as well, when

14  he gets up here and talks, is you will see the

09:33:01   15  introspection that he has had since then, since this whole

16  thing has come down.

17          THE COURT:  I read his letter with great

18  interest.

19          MR. ARDOIN:  I really -- I mean, honestly, Your

09:33:11   20  Honor, I say this because I have truly never seen the

21  progress in somebody; and I do think that that is worthy of

22  note, the fact that he has truly accepted and taken full

23  responsibility for his actions and, you know, the fact that

24  so much so he's -- he's even instituted -- he came to me

09:33:37   25  and said, Look, I want to start a compliance program within

1   my company.  I don't want this to ever happen again.

2                    I don't want greed to overtake me again.

3   I don't want any of my clients -- my clients, you know, my

4   customers, my employees, I don't want anybody to be in this

09:33:54   5   position again.  And I think that is worthy of something as

6   well, Your Honor.

7                    And, you know, it's just this is -- I

8   really do think 60 days is appropriate in this case.  I

9   think it places him higher than the two guys that were on

09:34:11  10   the low end of this -- of this conspiracy, because his

11   actions clearly was one of a policeman in making sure that

12   everybody was in line.  I don't dispute that at all.  But I

13   just -- I don't think he should be sentenced as high as the

14   two guys that were the 800-pound guerilla on the block when

09:34:32  15   it came to this thing.

16                    THE COURT:  Thank you, Counselor.

17                    MR. ARDOIN:  Thank you, Your Honor.

18                    THE COURT:  Mr. Kurji.  Mr. Kurji, this is your

19   opportunity to address me and to let me know what you wish

09:34:47  20   for me to consider.  As your counsel has pointed out, you

21   have been in this courtroom, I believe, when I have

22   sentenced other defendants and dealt with other parts of

23   this conspiracy.  Your counsel made the point, of which I

24   was going to remind you, in regards to theft, walking into

09:35:09  25   a bank with a gun versus doing it behind a desk with a

1  computer renders you no less a thief.  And that's what this

2  conspiracy was.  It was theft from your customers in that

3  they paid greater than they should have paid.  And when you

4  look at the victims of this theft, this conspiracy, they

09:35:37  5  were nonprofits.  They were churches who were attempting to

6  buy products for the good of the nonprofit, or for the

7  churches, so it wasn't a victimless crime.

8            In addition, the government has described

9  you as one of the ringleaders of this conspiracy.  The text

09:36:09  10  messages that they pointed out, and that I have seen,

11  suggest that that is true, and that you set the dinner up,

12  and you monitored your competitors' involvement in this

13  conspiracy.

14            Your attorney has suggested an alternative

09:36:31  15  reason for your actions, but as he pointed out on

16  questioning, he offered no evidence of that.

17            So, from this Court's point of view, I

18  have a defendant who, at a minimum, is one of the

19  co-ringleaders of this conspiracy, who now awaits a

09:36:55  20  decision on his sentencing.  You know that as to your other

21  defendants, I have found this to be an offense worthy of

22  imprisonment.

23            The question that I have, and I hope that

24  you will address, in addition to whatever else you wish to

09:37:22  25  address, is where on this spectrum of punishment that I

KATHY MILLER, RMR, CRR  -  kathy@miller-reporting.com

1  have already imposed on some of your co-conspirators should

2  you fall?

3              So, Mr. Kurji, your remarks, please.

4              THE DEFENDANT:  Yes, Your Honor.  I understand

09:37:38  5  that -- the evidence against me, but I am a man who takes

6  responsibility for anything I do, and the last years of my

7  life have been nothing short of a nightmare.  Your Honor, I

8  brought this upon myself.

9              Today, I stand before you as someone who

09:37:57  10  now, a convicted felon, carrying the stigma and

11  consequences that come along with it, whose actions have

12  deeply hurt those who depend on me the most:  My family and

13  my employees.  I fully accept responsibility for all my

14  actions, and feel a deep regret and humiliation about what

09:38:16  15  I have done.

16              I am ashamed of the pain I have caused my

17  son; my wife; my parents; my siblings, who are here today;

18  and my employees, who are here today, and whose livelihood

19  I jeopardized by committing this crime.  I want to

09:38:36  20  apologize to all of you and all the victims that I have

21  hurt.

22              I want to apologize to the Department of

23  Justice, Mr. Murphy, Ms. Gartner, Mr. Lewis.  I am truly

24  sorry for what I have done.  You have taught me a very

09:38:51  25  valuable lesson today.  I once -- while my legal situation

1 is certainly undesirable, I believe it has served a
2 purpose.  Sorry.  That purpose was to force me to take
3 accountability in all areas of my life, to become a better
4 person, and not to let greed and lust for money overpower
5 your personal ethics.  I know personal ethics -- sorry.
6 Not to let greed and lust for money and -- overpower your
7 personal ethics.  I know right from wrong, and I should
8 have never allowed myself to become part of this.
9                   On a company level, my team and I -- my
10 team and I have implemented a compliance handbook that
11 specifically addresses the Sherman Act, and many other
12 areas of the law to ensure that everyone in our company is
13 aware of the laws, and that we are in compliance with them
14 at all times.  We recently partnered with a local nonprofit
15 called "The H.E.A.R.T. Program" to create opportunities and
16 jobs for adults with disabilities so they can achieve their
17 potential.  I will be leading this initiative and mentoring
18 the adults myself.
19                   Going forward, I intend to use my misdeeds
20 to help prevent others from going down a similar path.  I
21 want to help young entrepreneurs to make legally sound
22 choices, and model ethical behavior for my son.  I am truly
23 thankful for the opportunity to live a changed life going
24 forward.  I have learned how to become a better father, a
25 husband, a brother, an employer and, most importantly, a

09:39:12
09:39:38
09:39:54
09:40:09
09:40:30

1  leader.  I have attended numerous personal growth and

2  meditation classes and surrounded myself with positive

3  influences and business mentors.

4              I am truly thankful for everyone who has

09:40:45  5  stood by me and for the opportunity to live a changed life

6  going forward.  I come before you as a man who accepted his

7  failures as his own, and a man who has -- who is not

8  pointing the finger.  Sorry.  I come before you as a man

9  who has accepted his failures as his own, not a man who is

09:41:07  10  pointing the finger at someone else.

11             Your Honor, I know there is a price to pay

12  for my actions, and that you must impose a punishment for

13  my crime.  I know you have said that prison time is

14  appropriate in these cases.  I am committed to using that

09:41:19  15  time, whatever it may be, to continue on a journey of

16  self-improvement and take full advantage of any classes or

17  programs that may help me be a better man upon my release.

18             I realize -- I realize that life doesn't

19  happen to you.  It happens for you.  I hope those around me

09:41:41  20  give me a second chance to let my actions speak louder than

21  my words and turn this experience into a positive change to

22  all the lives I will touch going forward.  Thank you.

23             THE COURT:  Thank you.  Ms. Gartner, are there

24  any victim-impact statements for this offense?

09:42:04  25             MS. GARTEN:  No, Your Honor.

1           THE COURT:  Very well.  Is there anything else

2  from the government at this time?

3           MS. GARTEN:  No, Your Honor.  I would just note

4  that Mr. Ardoin suggests that we don't want to believe what

09:42:12  5  he's proposing Mr. Kurji's role was in this conspiracy.  I

6  would just say that the government has followed the

7  evidence in this case, and this is what the evidence has

8  demonstrated, and that's what we put before you today.

9           THE COURT:  Thank you.  Anything else from the

09:42:24  10 defense?

11          MR. ARDOIN:  No, Your Honor.

12          THE COURT:  The Court has considered the

13 evidence before it as well as the argument of counsel and

14 the statement of the defendant.  The Court is also mindful

09:44:45  15 of the other sentences it has imposed in this case.

16          With that being said, the Court believes

17 that a departure from the guidelines is warranted, not only

18 for sentence parity among the defendants, but as well as

19 the lack of criminal history of this defendant.

09:45:08  20          Pursuant to the Sentencing Reform Act of

21 1984, it is the judgment of the Court that the defendant,

22 Akil Kurji, is hereby committed to the custody of the

23 Bureau of Prisons to be imprisoned for a term of eight

24 months.

09:45:21  25          Upon release from imprisonment, the

1  defendant shall be placed on supervised release for a term

2  of three years.  Within 72 hours of release from the

3  custody of the BOP, the defendant shall report in person to

4  the probation office in the district to which the defendant

09:45:35  5  is released.

6  While on supervised release, the defendant

7  shall not commit another federal, state, or local crime,

8  shall comply with the standard conditions that have been

9  adopted by this Court under General Order Number 2017-01,

09:45:49  10  abide by any mandatory conditions required by law, and

11  shall comply with the following additional conditions:

12  The defendant is required to provide the

13  probation office with access to any requested financial

14  information.  The probation officer may share financial

09:46:03  15  information with the United States Attorney's office.  If a

16  fine or restitution amount has been imposed, the defendant

17  is prohibited from incurring new credit charges or opening

18  additional lines of credit without approval of the

19  probation officer.  It is further ordered that the

09:46:18  20  defendant shall pay to the United States a special

21  assessment of $100.  It is further ordered that the

22  defendant shall pay to the United States a reduced fine of

23  $20,000.

24  Having assessed the defendant's ability to

09:46:28  25  pay, payment of total criminal monetary penalties shall be

1 due as follows:  The defendant shall make a lump sum

2 payment of $20,100 due immediately.  Balance, if any, due

3 in wages earned while in prison in accordance with the

4 BOP's Inmate Financial Responsibility Program.  Any balance

09:46:47 5 remaining after release from imprisonment shall be due in

6 monthly installments of $2,000 to commence 30 days after

7 release from imprisonment to a term of supervised release.

8 Payment is to be made to the United States District Clerk,

9 Southern District of Texas.

09:47:01 10            Mr. Kurji, you have a right to appeal your

11 conviction and your sentence.  You can appeal your

12 conviction if you believe your guilty plea was unlawful or

13 involuntary or if there was some other fundamental defect

14 in the proceeding that was not waived by your guilty plea.

09:47:15 15 You also have a statutory right to appeal your sentence

16 under certain circumstances, particularly if you think the

17 sentence is contrary to law.

18              If you appeal, that appeal must be filed

19 within 14 days of the entry of judgment.  If you cannot

09:47:27 20 afford to pay the cost of appeal, you can ask to proceed

21 without paying the costs and you have the right to have an

22 attorney appointed to represent you on appeal if you cannot

23 afford an attorney.

24              This Court, being confronted with the

09:47:42 25 facts and the defendants in this conspiracy, has had a

 1  heavy burden placed on it in having to deal with the extent

 2  of this conspiracy.  And while, as counsel and I have

 3  discussed, no gun was used, there were real victims in this

 4  case.  I hope that these sentences send a message to others

09:48:07  5  who may find themselves in similar circumstances, that

 6  there will be real consequences for choosing this course of

 7  action.

 8              Anything else from the government?

 9              MS. GARTEN:  No, Your Honor.

09:48:21  10              THE COURT:  Anything else from the defense?

11              MR. ARDOIN:  Just that we would request

12  self-surrender, Your Honor.

13              THE COURT:  Ms. Jones, in connection with this

14  defendant's cooperation, and following the conditions, have

09:48:32  15  there been any problems?

16              PROBATION OFFICER:  No.  I have spoken to the

17  pretrial officer, Your Honor, and he is in full compliance

18  of his conditions of release.

19              THE COURT:  Thank you.  Any objection from the

09:48:43  20  government?

21              MS. GARTEN:  No, Your Honor.

22              THE COURT:  Mr. Kurji, you have had certain

23  conditions imposed upon you while awaiting this sentencing

24  date.  The sentencing date now has arrived.  Your counsel

09:48:52  25  has asked that you be allowed to self-surrender.  The same

1 conditions that have been imposed on you will remain in

2 effect until you are notified to surrender.  If I am made

3 aware that any of the conditions have been violated, I will

4 issue an order for your immediate arrest.

09:49:08  5                     Do you understand, sir?

6                THE DEFENDANT:  Yes, Your Honor.

7                THE COURT:  Very well.  Then, your motion

8 request is granted.

9                MR. ARDOIN:  Thank you, Your Honor.

09:49:16  10                THE COURT:  Anything else, sir?

11                MR. ARDOIN:  No, Your Honor.

12                THE COURT:  Anything else from probation?

13                PROBATION OFFICER:  No, Your Honor.

14                THE COURT:  Very well.  We are adjourned.  You

09:49:24  15 are excused.

16 (Proceedings adjourned at 9:49 a.m.)

17                COURT REPORTER'S CERTIFICATE

18

19      I, Kathleen K. Miller, certify that the foregoing is a

20 correct transcript from the record of proceedings in the

21 above-entitled matter.

22

23                                /s/_____
   DATE: Aug. 21, 2019           Kathleen K. Miller, RPR, RMR, CRR
24

25